Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

RANDY WASHINGTON,                          :
                                           :
            Plaintiff,                      :        Civ. No. 17-7243 (PGS)(TJB)
                                           :
      v.                                    :
                                           :
CHARLES ELLIS, et al.,                      :        **OPINION**
                                           :
            Defendants.                     :
_____    :

## PETER G. SHERIDAN, U.S.D.J.

### I.  INTRODUCTION

Plaintiff, Randy Washington ("Plaintiff"), is a state prisoner currently incarcerated at New Jersey State Prison ("NJSP") in Trenton, New Jersey. He is proceeding with a civil rights amended complaint against the following Defendants Warden Charles Ellis ("Ellis"), Sergeant Timothy Friel ("Friel"), John Doe Mercer County Correctional Center ("MCCC") employees, John Doe Mercer County Sheriff's Officers, Mercer County Jail medical staff, Deputy Warden Oliver ("Oliver"), Sergeant Tamaine Grier ("Grier") (hereinafter "Defendants"). (ECF No. 38.) Presently pending before this Court is Defendants' revised motion for summary judgment (ECF No. 221), Plaintiff's response (ECF No. 241), and Defendants' reply

(ECF No. 242). For the following reasons, the motion for summary judgment is granted.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

On September 17, 2017, Plaintiff filed his initial complaint. (ECF No. 1.) Plaintiff is currently housed at NJSP, but the events alleged took place at Mercer County Courthouse and Mercer County Correctional Center. (*See id.*) Plaintiff alleged violation of his Fifth, Eighth, and Fourteenth Amendment rights for alleged excessive use of force, cruel and unusual punishment, deliberate indifference- denial of medical care. (*See id.*) On May 3, 2018, the Court screened Plaintiff's initial complaint for dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B). (ECF No. 11.) Upon screening, the Court proceeded Plaintiff's Eighth Amendment excessive force and Fourteenth Amendment deliberate indifference denial of medical care claims. (*Id.*)

On December 26, 2018, Plaintiff filed an Amended Complaint. (ECF No. 38.) Plaintiff's claims arise out of an incident that occurred on June 29, 2017, in the Mercer County Courthouse. (ECF No. 38.) On June 29, 2017, Plaintiff hit Jessica Lyons, the deputy public defender for Mercer County who was representing him. (ECF No. 241-2, Pl. Stat. Of. Mat. Facts ("PSOMF") ¶ 1.) Defendants' and Plaintiff's version of events that took place next differ.

Plaintiff submits that after striking his attorney, he did not advance towards her. (ECF No. 38 at 6.) Rather, he waited to be handcuffed and allowed the officers

to restrain and handcuff him without resistance. (PSOMF ¶ 1.)  Plaintiff alleges that approximately five seconds later, Officers "acted vindictively in their takedown by 'slam[ing] [him] on the ground to inflict pain on [him] for hitting [his] public defender' even though he was under their control." (*Id.* ¶ 3, quoting ECF No. 38 at 6.) He alleges as officers took Plaintiff to the floor, one of the sheriff's officers came down on Plaintiff's hand, causing the bones in his hand to break. (*Id.* ¶ 4.) Plaintiff was taken out of the courtroom in handcuffs and in the hallway leading to the holding cell, the officers threw him "against a wall and one of the sheriffs kept trying to tighten the handcuffs" and "twisting the cuffs around his broken hand." (*Id.* ¶ 6.) Plaintiff submits that once he was in the holding cell, he notified the corrections officers of his injuries and rather than provide medical care, officers took Plaintiff to MCCC. (*Id.* ¶ 8.)

Defendants argue that "Plaintiff did not '*wait* for the sheriff to come handcuff' him, as Mercer County Sheriff's Officer Michael Restuccia leapt forward and engaged Plaintiff one (1) second after he punched his Public Defender." (ECF No. 221-1, Def. Stat. of Mat. Facts ("DSOMF") ¶ 2.) Defendants submit that per video that has been produced in this matter, Plaintiff punched Ms. Lyons in the face at 3:48:06 p.m. (*Id.* ¶ 4.) Officer Restuccia physically engaged Plaintiff one (1) second after. (*Id.*) Mercer County Officer Joel Adams engaged with Plaintiff one (1) second after Officer Restuccia. (*Id.*) Five (5) seconds after the punch, Plaintiff is taken to

the floor by both officers. (*Id.*) Defendants submit that per the video, Plaintiff can be seen led out of the courtroom and held in a hallway, where Sheriff's Officers placed Plaintiff against the wall without force. (*Id.* ¶ 9.) At not time do officers appear to twist or tighten Plaintiff's handcuffs. (*Id.*) Defendants argue that per the video, once in the holding cell, Plaintiff did not "show" or display his hand as he claims. (*Id.*)

Regarding Plaintiff's medical care, Plaintiff alleges upon arriving back at the Mercer County Correctional Center ("MCCC"), Plaintiff asked to go to the hospital and was told to wait for Sergeant Friel. (ECF No. 38 at 7.) When Sergeant Friel arrived, Plaintiff told Sergeant Friel that he needed to go to the hospital for his injured hand. (*Id.*) Sergeant Friel took Plaintiff to the nurse but told Plaintiff that they did "not send inmates to the hospital anymore, we can give you ice." (*Id.*) Plaintiff submits that his injured hand "looked like two hands put together with a baseball on it." (PSOMF ¶ 10.) Plaintiff was offered ice, but when tried to tell Sergeant Friel that ice would not help because his hand was broken, Sergeant Friel told Plaintiff that he was refusing medical care and took Plaintiff back to his cell. (ECF No. 38 at 7.)

Plaintiff asked Sergeant Grier to take him to the hospital, but she said that Sergeant Friel had said Plaintiff refused medical care. (PSOMF ¶ 12.) Plaintiff clarified that he only refused the ice and wanted treatment for his broken hand. (*Id.*)

4

Sergeant Grier took Plaintiff back to the nurse for ice. (*Id.*) Plaintiff did not receive any pain medication for his hand. (*Id.*)

Medical records from June 29, 2017, indicate that Plaintiff was brought to the nurse and Nurse Margarita Sheynberg noted that Plaintiff showed no signs of acute distress, his right hand was swollen, and he refused ice and pain medications. (DSOMF ¶ 25.) The medical note also indicates that a medical doctor call was placed for the next day and an x-ray was ordered. (*Id.*) The following day, June 30, 2017, Dr. Jennifer Petrillo of MCCC's Medical Department ordered an x-ray for Plaintiff. (*Id.* ¶ 29.) Plaintiff alleges Warden Charles Ellis and Deputy Warden Phyllis Oliver examined Plaintiff's hand and instructed him to take x-rays to determine if the hand was broken. (PSOMF ¶ 13.)

On July 4, 2017, Patient Care Associates ("PCA") came to MCCC and performed Plaintiff's x-ray. (DSOMF ¶¶ 29-30.) The radiology report concluded that Plaintiff suffered an "acute right 4th metacarpal diaphyseal fracture" of his right hand. (*Id.* ¶ 30.) The following day, on June 5, 2017, Dr. James Neal of MCCC's Medical Department acknowledged the radiology report and completed an "off site authorized medical services request" for Skylands Orthopedics ("Skylands"), requesting evaluation and treatment. (*Id.*)

Plaintiff's initial appointment with Skylands was scheduled for Tuesday, July 25, 2017, but did not take place until the following day, Wednesday, July 26, 2017.

(*Id.* ¶ 32.) Surgery was scheduled and performed on Plaintiff's hand on August 2, 2017. (*Id.*)

On January 18, 2023, Defendants filed a motion in limine to introduce into evidence the redacted surveillance video footage of the courtroom and hallways surrounding the courtroom at and around the time of the June 29, 2017 incident. (ECF No. 209.) On February 8, 2023, Defendants filed a motion for summary judgment. (ECF No. 212.) On February 21, 2023, the Court held a teleconference on Defendants' motion in limine. On February 23, 2023, the Court granted Defendants' motion in limine in part and ordered Defendants to submit a newly redacted surveillance video and a revised motion for summary judgment. (ECF No. 218.) On March 8, 2023, Defendants submitted a revised motion for summary judgment arguing that the record lacks sufficient evidence to permit a reasonable jury to find in favor of Plaintiff on his excessive force and deliberate indifference claims. (ECF No. 221.) Plaintiff filed a reply on June 2, 2023. (ECF No. 241.) The Court held oral argument on June 5, 2023.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment. *See id.*

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A party asserting that a fact [is not] genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . ., affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *See Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas.*

*Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)). "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). The Court's role in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## IV. DISCUSSION

Defendants argue Plaintiff's excessive force and deliberate indifference to medical care claims should be dismissed.

### 1. *Excessive Force*

Defendants argue that Plaintiff's excessive force claim should be dismissed because surveillance video of the take down of Plaintiff in the Mercer County courtroom and his subsequent escort out of the courtroom clearly contradicts Plaintiff's version of events. (ECF No. 221-3 at 3-10.)

When an inmate alleges that a prison official used excessive and unjustified force, the Eighth Amendment controls. *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986)). The subjective inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillan*, 503 U.S. 1, 7 (1992); *see also Giles v. Kearney*, 571 F.3d 318, 328 (3d Cir. 2009). The objective inquiry is whether the inmate's injury was more than de minimis. *Id.* at 9–10.

The relevant factors the court must consider are:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

*Giles v. Kearney*, 571 F.3d at 328.

Generally, summary judgment is inappropriate on an excessive force claim when parties offer conflicting testimony regarding the material events surrounding the alleged force. *Suarez v. City of Bayonne*, 566 F. App'x, 181 (3d Cir. 2014). The United States Supreme Court has reasoned that the existence of a videotape recording, however, presents an "added wrinkle" to the general standard requiring the court to construe facts in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "Where there is a video recording of the relevant

events, the Court views the facts as depicted in the recording, rather than in the non-movant's favor whenever the recording 'blatantly contradict[s]' the non-movant's version such that 'no reasonable jury could believe it.'" *Knight v. Walton*, 660 F. App'x 110, 112 (3d Cir. 2016) (alteration in original) (quoting *Scott*, 550 U.S. at 380–81). The decision only applies if the video blatantly contradicts a plaintiff's version of events. *See El v. City of Pittsburgh*, 975 F.3d 327, 333 (3d Cir. 2020); *Patterson v. City of Wildwood*, 354 F. App'x 695, 697-98 (3d Cir. 2009). If a review of the videotape "refutes an inmate's claims that excessive force was used against him, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate." *Smalls v. Sassaman*, 2019 WL 4194211, at *8 (M.D. Pa. Sep. 4, 2019) (citing *Tindell v. Beard*, 351 Fed. App'x 591 (3d Cir. 2009)).

Defendants rely on *Scott* and argue the surveillance video of Plaintiff's take down and his subsequent escort out of the courtroom clearly contradicts Plaintiff's version of events. In his amended complaint and deposition, Plaintiff claims that after he punched his attorney, he "waited for the sheriff to come handcuff [him]," and that it was "about five seconds before the sheriffs tackle [] [him]." (ECF No. 38 at 6; ECF No. 212-5, Pl. Deposition ("Pl. Depo.") at 16:14-22.) Plaintiff also alleged in his amended complaint and testified at his deposition that sheriff's officers "tackle [him] on the table" and he "was under control when [they] had [him] on the table,"

that he was "leaned [] over the table" with this "hands down . . . like holding the table . . . [and he] was bent over the table frontwards." (ECF No. 38 at 6; Pl. Depo. at 17:3-4, 18:2-19.) Plaintiff testified at his deposition that the first officer who had him under control did not intend to take Plaintiff to the floor, but another officer told him to "take him down." (Pl. Depo at 20:18-24.) Plaintiff testified that one of the officers broke his hand when Plaintiff was slammed to the floor and the officer came down on his hand. (*Id.* at 31:3-11.) Plaintiff also testified that the officer's actions were intentional, and they tried to "aggressively slam [him] down to inflict pain because of what [he] did." (*Id.* at 33:7-11.)

Plaintiff claims that after being taken out of the courtroom, he was "throw[n] [] up against the wall and one of the sheriffs kept trying to tighten the handcuffs on my hand." (ECF No. 38 at 6.) During his deposition, Plaintiff testified that he was thrown against the wall after being brought out of the courtroom. (Pl. Depo. at 33:6-9.) Plaintiff described the place where this event occurred as "once you get out there [out of the courtroom] you make the first right in the little other hallway, the hallway by the cell door, the bullpens." (*Id.* at 33:11-13.) Once in that "other hallway," Plaintiff claims that the sheriff's officers "slammed [him] up against the wall," not headfirst, "more chest and chin" first. (*Id.* at 35:7-11.)

Defendants argue that the video contradicts Plaintiff's version of events. Plaintiff did not "wait for the sheriff to come handcuff" him, as Mercer County

Sheriff's Officer Michael Restuccia leapt forward and engaged Plaintiff one (1) second after he punched his attorney. (ECF No. 221-4, Ex. A, Final Redacted Video Surveillance ("Video") at 55:37-55:38.) The video shows that Sheriff's Officer Restuccia did not "tackle [Plaintiff] [] on the table," nor did the sheriff's officers ever have Plaintiff "under control when they had [him] [] on the table," or have him "bent over the table forwards." The video shows, Plaintiff punch his attorney in the face at 3:48:06 p.m. (*Id.* at 55:37.) Officer Restuccia physically engaged Mr. Washington one (1) second after. (*Id.* at 55:38.) Mercer County Sheriff's Officer Joel Adams engaged with Plaintiff one second (1) after Officer Restuccia. (*Id.* at 55:39.) At no time is Plaintiff bent over the table and under control. Plaintiff was taken to the floor five (5) second after the punch by both officers. (*Id.* at 55:42.)

The video of the hallway outside of the courtroom also contradicts Plaintiff's version of events. Plaintiff can be seen being led out of the courtroom and held in the hallway. (*Id.* at 1:02:52-1:05:33.) The video shows officers place Plaintiff against the wall and hold him there. (*Id.* at 1:03:22-1:05:33.) It does not show Plaintiff being "slammed" against the wall. You cannot clearly see Plaintiff's hands or handcuffs. While the video does not appear to show officers twisting or tightening Plaintiff's handcuffs, it does not clearly show that they did not. (*Id.*)

Plaintiff argues that *Scott* is inapposite and inapplicable to the instant case. Plaintiff relies upon *Rossi v. City of Trenton*, Civ. No. 18-12708, 2023 WL 1361390,

at *5 (D.N.J. Jan. 31, 2023), where the court addressed the applicability of *Scott* and found that it did not apply where the video was "in low-quality resolution," and it was "unclear as to Plaintiff's allegations that officers punched him in the face while he was laying on the floor." *Id*. Plaintiff argues that the video quality is poor and there is no audio. Plaintiff argues that the video in fact depicts various officers jumping in to take Plaintiff down and these same officers are on top of Plaintiff for several minutes. (ECF No. 241, citing Video at 55:35-1:02:52.) Plaintiff argues that the video:

> shows that Plaintiff was indeed briefly hunched over the desk before being taken down by the officers. Def's Ex. B, Final Redacted Courthouse Video, 59:17-59:18. The video also confirms Plaintiffs' testimony that his hands were behind his back as a sign of surrender because he knew that there could be consequences for his actions. Def's Ex. B, Final Redacted Courthouse Video, 59:38-59:41. However, after Plaintiff surrenders, the officers performed a takedown as though there was an ongoing threat to their or others' safety, which the video shows was not the case. *Id*.

(ECF No. 241 at 16.)

The Court notes that Plaintiff cites to improper video timestamps. However, the video does not show Plaintiff "briefly hunch over the desk", nor does it show Plaintiff's hands were behind his back. (Video at 55:33-55:42.)

Even viewed in the light most favorable to Plaintiff, the video evidence shows that two officers took Plaintiff to the ground within five seconds of the unprovoked

punching of his attorney, once on the ground he was restrained there until he could be taken from the courtroom, and once taken from the courtroom there is no clear evidence of excessive force. There is no evidence in the record that show that within the five second take down an officer sadistically and maliciously came down on Plaintiff's hand to break it. While it is not totally clear if an officer's knee landed Plaintiff's hand at any point or if an officer tightens Plaintiff's handcuffs in the hallway, it does not appear as though the video evidence would permit a reasonable jury to conclude that Defendants utilized excessive force in violation of the Eighth Amendment.

Additionally, considering the relevant factors the court must consider in determining whether force was applied maliciously and sadistically to cause harm, there was an immediate need for the application of force, as Plaintiff had just punched his attorney; the need for force was based on Plaintiff's unprovoked punching of his attorney and the video shows the forced used was two officers immediately taking Plaintiff to the ground and holding him there until he could be escorted from the courtroom; and the officers reasonably perceived Plaintiff has a threat in that moment. *Giles*, 571 F.3d at 328. Considering the facts and evidence in the light most favorable to Plaintiff, Defendants' use of force was objectively reasonable under the circumstances. *Kopec v. Tate*, 361 F.3d 772, 776-77 (3d Cir.2004) (noting that summary judgment for a defendant proper on an excessive

force claim where use of force objectively reasonable under circumstances). Accordingly, Defendants' motion for summary judgment is granted as to this issue.

### 2. Deliberate Indifference

Defendants argue that Plaintiff's deliberate indifference to his medical needs claim is negated by the medical records. (ECF No. 221-3 at 10-20.)

The Eighth Amendment prohibits the states from inflicting "cruel and unusual punishment" on those convicted of crimes. *Rhodes v. Chapman*, 452 U.S. 337, 344–46 (1981). This proscription against cruel and unusual punishment requires prison officials to provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. *Id.* at 106.

To satisfy the first prong of the *Estelle* inquiry, the inmate must demonstrate his medical needs are serious. Serious medical needs include those that have been diagnosed by a physician as requiring treatment or are so obvious a lay person would recognize the necessity for a doctor's attention, and those conditions which, if untreated, would result in lifelong handicap or permanent loss. *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

15

The second element of the *Estelle* test requires an inmate to show prison officials acted with deliberate indifference to his serious medical need. "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994). A plaintiff alleges deliberate indifference "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. *Andrews v. Camden Cty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000). Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990). "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment. Implicit in this deference to prison medical authorities is the assumption that such informed judgment has, in fact, been made." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotations and citations omitted). Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be

16

proved is medical malpractice and not an Eighth Amendment violation. *Estelle*, 429 U.S. at 105–06; *White*, 897 F.2d at 110.

### Defendants Sergeant Friel and Sergeant Grier

Defendants Sergeant Friel and Sergeant Grier move for summary judgment on Plaintiff's deliberate indifference claim against them, arguing Plaintiff was being treated by medical professionals and Defendants Friel and Grier did not control the medical decisions made for Plaintiff.

Plaintiff testified that, upon the arrival of MCCC officers at his holding cell, he asked Sergeant Palmer for medical treatment and showed Sergeant Palmer his hand. (Pl. Depo. 35:21-24.) At no time in the video does Plaintiff "show" any officer his hand. (Video at 1:51:27-1:55:40.) However, there is no audio on the video recording, so it is unclear if Plaintiff told any of the officers about an injury to his hand. Defendants argue that the video evidence post-punch does not support Plaintiff's allegations regarding his pain level as it shows "Plaintiff utilizing his right hand while unbuttoning his sleeve and shirt; pulling an item out of his pants pocket; pulling off his dress socks; folding his dress pants; removing his undershirt; adjusting his clothes; pulling his orange jumpsuit quickly over his shoulder; adjusting his skullcap; zipping up his jumpsuit; pulling up his socks and tucking his pantlegs into same; putting on his shoes, etc." (ECF No. 221-3, citing Video 1:52:20-1:55:13.)

17

Defendants note that Sergeant Palmer and three corrections officers who were involved in Plaintiff's transport from the courthouse back to his correctional facility after the incident all completed incident reports and that none of the incident reports indicate that Plaintiff suffered an injury. (*See* ECF No. 221-1 at ¶ 15-19, citing ECF 212-6 at 2-6.)

Plaintiff testified that after his return to MCCC, his injury to his right hand was so severe that he "almost passed out from the pain." (Pl. Depo. at 39:9-10.) He stated that his right hand "looked like two hands put together with a baseball on it and [that] you could actually see the bone right there, like, it's pushed in." (*Id.* at 39:21-23.) He described the hand as "[m]ore than swollen. You see the bones going and the whole hand just it looked like before a boxer put the boxing gloves on." (*Id.* at 40:4-6.) However, after saying it was "swollen," Plaintiff stated that "[i]t wasn't swollen. I know what swollen looks like, but it was, it was more of a - - I do know the hand, like, if you broke a bone, you would see your bone out of place." (*Id.* at 40:8-15.)

Plaintiff testified that as soon as he was back in his cell, he requested Defendant Friel take him for medical treatment but Defendant Friel "didn't want to hear nothing." (*Id.* at 37:7-12.) Plaintiff testified Defendant Friel did not take him to medical until sometime later. (*Id.* at 38:17-21.) However, according to Defendant Friel's June 29, 2017 incident report, Plaintiff complained of injury at 6:00 p.m. and

was taken by him to the medical department 6:15 p.m. (ECF No. 212-6 at 19.) Defendant Friel indicated that Plaintiff was seen by medical staff and refused all treatment offered. (*Id.*)

Plaintiff was seen by Nurse "Rita" [Margarita Sheynberg]. (Pl. Depo. at 38:24 to 39:1.) Plaintiff alleges that he told Nurse Rita that he needed to go to the hospital, and she was "about to say[] something and then Friel, you know, he did his little thing, cut her off, told her to shut up." (*Id.* at 39:8-14.) Plaintiff testified that Defendant Friel said "we don't do that no more, we don't take to the hospital." (*Id.* at 40:18-23.) Plaintiff testified that he was told they could give him ice, but he refused because did not need ice, he needed to go to the hospital. (*Id.* at 41:2-11.)

Defendant Friel answered Plaintiff's deposition questions, and certified that:

> [Plaintiff] was secured in his cell and then taken to the medical department . . . I do not recall exactly when I saw his hand . . . I do not recall what my thoughts about his hand were while we were in the medical department. Additionally, I am not a medical expert and cannot evaluate or diagnose such an injury [broken hand]. I recall the nurse evaluating [Plaintiff's] hand, offering him ice, and stating that she was ordering an x-ray be conducted at the facility. . . Also, I did not give him ice. The medical staff offered him ice after examining and evaluating him on the medical unit.

(ECF No. 212-6 at 8-9.) Defendant Friel indicated that he did not know why Plaintiff was not sent to the hospital, that it was a "medical decision made by medical staff after examination and evaluation." (*Id.* at 9.)

Nurse Sheynberg's medical chart note indicates that Plaintiff was in no acute distress when he was seen, and he refused ice and pain medication. (*Id.* at 21.) Nurse Sheynberg noted that she placed a doctor's call for the following day and ordered an x-ray. (*Id.*)

Defendants note that MCCC's Policy E-08: Emergency Services, provides that *medical staff* make the determinations of whether an inmate needs off-site medical services based on the clinical assessment, and the priority level of medical services, i.e., immediate transport (Stat Run), one (1) hour transport (Emergency), one (1) to three (3) hours (Urgent), or today (by the end of tour). (ECF No. 221-1 ¶ 23, citing 212-6 at 11-17.)

With regard to Defendant Grier, Plaintiff alleges:

> when she came on I asked Sgt. Grier I need to go to the hospital. And she said Sgt. Friel said you refuse. I told her I refuse ice my hand is broken. What is ice gonna do. I showed her she came back and said go get some ice to stop the swelling. When I got there the ice was up there ready. I asked the nurse look at my hand it's broken. Sgt. Grier just said let's go. And give me that look it's out of her hands. I was not going to the hospital. And no one give me any pain pills for my hand and finger.

(ECF No. 38 at 8.) Plaintiff admits that when he complained of pain to Defendant Grier, Defendant Grier returned Plaintiff to the medical department. In her answers to Plaintiff's deposition questions, Defendant Grier certified that she "recall[ed] him saying something about his hand being injured," that she saw his hand, that she

had "no medical training or certification to make" an assessment as to whether Plaintiff's hand was broken. (ECF No. 212-7 at 7.) When asked by Plaintiff why he was not sent to the hospital, Defendant Grier explained that "inmates are sent to the hospital based on the directives of qualified medical personnel." (*Id.*) Defendant Grier indicated that there was nothing she could do for Plaintiff, "any medical treatment would have been administered by medical staff." (*Id.*)

As discussed below Plaintiff did receive medical treatment, and it does not appear that Defendants Frier and Grier controlled the decisions of the medical staff treating Plaintiff. *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d. Cir. 2001) (holding that prison administrators were not "deliberately indifferent" by failing to respond to complaints of a prisoner being treated by a prison medical doctor); *see also Smith v. O'Boyle*, 251 F. App'x 87, 89 (3d Cir. 2007) (affirming dismissal of § 1983 claim against prison officials because "[p]rison officials who are not physicians are entitled to defer to the medical judgment of staff physicians"). Absent a "belief or actual knowledge that medical personnel mistreated or failed to treat a prisoner," Defendants Frier and Grier, as non-physicians, cannot be charged with the Eighth Amendment scienter requirement of deliberate indifference. *Innis v. Wilson*, 334 F. App'x 454, 456-57 (3d Cir. 2009) (affirming dismissal of prisoner's deliberate indifference claim against non-medical prison officials). Based on the record, it does

21

not appear that Defendants Friel and Grier had actual knowledge that medical personnel failed to treat Plaintiff.

Additionally, the evidence of record does not show that based on the facts alleged Defendant Friel and Grier were deliberately indifferent to Plaintiff's medical condition. Plaintiff testified that both Defendants took him to the medical department after he complained of pain. Although, Plaintiff alleges that Defendant Friel told the nurse that the prison no longer takes inmates to the hospital, the medical records show that Nurse Sheynberg indicated that Plaintiff was in no acute distress when he was seen, and she placed a doctor's call for the following day and ordered an x-ray. (ECF No. 212-6 at 21.)

The evidence of record does not show that Defendants Grier and Friel refused Plaintiff medical treatment or delayed Plaintiff's treatment for non-medical reasons. Nor, did Defendants prevent Plaintiff from receiving recommended treatment. *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987). Instead, Defendants Friel and Grier took Plaintiff to the medical department, who then took over and decided the proper course of action for Plaintiff. The record does not show that Defendants Friel and Grier acted with deliberate indifference. Therefore, Defendants' Friel and Grier motion for summary judgment will be granted.

### Defendants Warden Ellis and Deputy Warden Oliver

Regarding Defendant Deputy Warden Oliver, Plaintiff alleges that the day of incident, his mother spoke to Defendant Oliver on the phone about Plaintiff's hand. (ECF No. 38 at 11.) Regarding Defendant Warden Ellis, Plaintiff alleges Defendant Ellis and Defendant Oliver discussed Plaintiff's hand and informed Plaintiff that he needed to get an x-ray first and see if it was broken. (*Id.* at 9-11.)

In Defendant Ellis's answers to Plaintiff's deposition questions, he indicates that he has no recollection of seeing Plaintiff's hand or having conversations with Plaintiff about his injury. (ECF No. 212-7 at 26.) Defendant Oliver answered that she was never informed of Plaintiff's injury and never saw his hand. (*Id.* at 28.)

It is reasonable for prison administrators, who are aware that a particular inmate is receiving medical treatment from the prison medical staff, to defer to the treatment and diagnosis decisions of such staff members even after receiving complaints from the inmate suggesting that he disagrees with the treatment decisions or believes them to be inadequate. *Durmer*, 991 F.2d at 69 (holding that prison administrators could not "be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor"). Defendants Oliver and Ellis may have had general supervisory authority over the medical defendant and other members of the prison staff, but Plaintiff fails to provide evidence that they were directly involved

23

in Plaintiff's medical treatment, nor does it appear that they participated in making the diagnosis and treatment decisions or caused the delays that underlie the amended complaint. Based on the record, there is no evidence that Defendants Ellis and Oliver had actual knowledge that medical personnel failed to treat Plaintiff. *Matthews v. Pennsylvania Dep't of Corr.*, 613 F. App'x 163, 170 (3d Cir. 2015) (citing *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)) ("[a]bsent a reason to believe (or actual knowledge) that prison doctors . . . are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.") Accordingly, Defendants' Ellis and Oliver motion for summary judgment is granted and Plaintiff's deliberate indifference claims against them are dismissed.

### Defendants MCCC Medical Staff

Plaintiff alleges in his amended complaint that when he returned to MCCC on June 29, 2017, from the courthouse, MCCC medical staff failed to come see him, and when he was taken to the medical department, the medical staff did not provide treatment or transfer him to a hospital. (ECF No. 38 at 9.)

Deliberate indifference requires proof that the official "knows of and disregards an excessive risk to inmate health or safety." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). If there is a dispute over the adequacy of the received

treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician. *Little v. Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa.), aff'd, 101 F.3d 691 (3d Cir. 1996).

As explained above, when Plaintiff was brought to the medical unit, Nurse Shenyberg noted that Plaintiff was not in acute distress, and he refused ice and pain medication. Nurse Shenyberg placed Plaintiff on the doctor's call list for the next day and indicated an x-ray was ordered. (ECF No. 212-6 at 21.) Defendants summarized the following course of treatment Plaintiff received:

> The next day, Friday, June 30, 2017, Dr. Petrillo reviewed the notes and placed an order for an x-ray to be done. Defs.' Exhibit I. The next available x-ray date was Tuesday, July 4, 2017, and Plaintiff underwent an x-ray. *See* Defs.' Exhibits J, at 2 ¶ 5, and K. On Wednesday, July 5, 2017, after receiving and reviewing the radiologist's report, Dr. Neal submitted a referral to Skylands. Defs.' Exhibit K, L and M.
>
> Senior Medical Records Clerk Karla Ramsey explained the process as follows:
>
>> "When an orthopedic appointment is required, the MCCC's Health Services Administration (HSA) at the MCCC will call Skylands with a referral and seek to make an appointment. Skylands will then request x-rays and all other diagnostic information. Once that documentation is received by Skylands, Skylands sets up the appointment date and time. Unfortunately, everything is a process. Once Dr. Neal signed the order on July 5th, a Wednesday. He would put the order in a basket to be processed by HSA

staff. Most likely, HSA would have gotten the order the next day and made a call, which would have been July 6th, a Thursday. As explained, Skylands would request all the medical documentation and the x-rays be sent to them. MCCC's HSA would then comply. This could take a day or so. Skylands would then receive and review the documentation and then contact the MCCC to inform them of the scheduled date and time for the appointment."

Defs.' Exhibit J, at 2-3, ¶ 7-8.

Per Skylands' records, Plaintiff's first evaluation/appointment for July 25, 2017 with Skylands, was initially scheduled by Skylands on Tuesday, July 11, 2017. Defs.' Exhibit N, at 1. As per the notation in Skylands' appointment detail record, the original appointment set up by Skylands was pushed back a day by Skylands. *Id.* Plaintiff's surgery was scheduled for, and performed on Wednesday, August 2, 2017. Defs.' Exhibits O and P, at 1-2. MCCC's documentation, Skylands' records and Ms. Ramsey's certification make clear that once the referral was made to Skylands, and the medical records and reports were provided to that orthopedic group, the scheduling of all further orthopedic treatment was beyond the purview of MCCC's Medical Department. *See* Defs.' Exhibits J, L, M, and N. Additionally, Plaintiff was seen by MCCC nurses in the interval between his initial complaint and his surgery. Defs.' Exhibit M, at 2. He voiced no complaints and never asked for medications. *Id.*

(ECF No. 221-3 at 15-16.)

The record before the Court demonstrates that Plaintiff received substantial medical treatment. It appears that the attention Plaintiff received lacks the requisite

deliberate indifference to support a Section 1983 claim. Plaintiff was seen by prison medical staff the day of the incident. Nurse Sheynberg put Plaintiff on the doctor call list for the next day and ordered an x-ray. (ECF No. 212-6 at 34.) The following day, June 29, 2017, Dr. Petrillo ordered an x-ray. (*Id.* at 23.) The next available day for an x-ray was July 4, 2017, and Plaintiff received an x-ray on that day. (*Id.* at 30.) On July 5, 2017, after receiving the radiologists, report, Dr. Neal submitted a referral to Skylands. (*Id.* at 35.) Six days later, on July 11, 2017, Skylands scheduled Plaintiff for July 25, 2017 appointment, but Skylands ended up pushing the appointment back one day, to July 26, 2017. (*Id.* at 32, 37.) Plaintiff's surgery was scheduled for and performed on August 2, 2017. (ECF No. 212-7 at 4-5.) The medical records in evidence show that during the time period between Plaintiff's x-ray and surgery, Plaintiff was seen by MCCC medical staff for medical rounds on July 7, 2017 and July 21, 2017, and the medical records indicate that Plaintiff "voiced no concerns" at those visits. (ECF No. 212-6 at 35.)

Plaintiff has failed to show that MCCC medical staff refused him treatment. Instead, as shown above, it appears Defendants MCCC medical staff promptly scheduled Plaintiff for the tests necessary. The record also does not support Plaintiff's allegations that Defendants delayed Plaintiff's medical treatment. Rather, the evidence shows Skylands was responsible for scheduling and performing Plaintiff's surgery. Additionally, the Plaintiff's medical notes from the time he was

waiting for surgery indicate that Plaintiff did not voice any concerns to MCCC medical staff. Plaintiff did not submit any medical reports to the contrary. Plaintiff has failed to present evidence to show that Defendants were aware of a serious risk to Plaintiff and failed to provide the care needed. *See Andrews v. Camden Cty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000) (noting that a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference); *see also White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) ("mere disagreements over medical judgment do not state Eighth Amendment claims.") Therefore, Defendants' MCCC medical staff motion for summary judgment is granted as to Plaintiff's Eighth Amendment failure to provide medical care claim.

## V.  CONCLUSION

For the reasons expressed above, the Court will grant Defendants' motion for summary judgment (ECF No. 221) and will dismiss Plaintiff's Complaint. An appropriate order follows.

Dated:  July 25, 2024

*s/Peter G. Sheridan*  
PETER G. SHERIDAN, U.S.D.J.